BANK OF AMERICA, N.A.[1] *vs.* PRESTIGE IMPORTS, INC.,
& others.[2]

No. 07-P-890.

Norfolk. April 16, 2008. - November 19, 2009.

Present: McHUGH, KATZMANN, & GRAINGER, JJ.

*Bank. Uniform Commercial Code,* Bank, Good faith. *Negligence,* Bank, In cashing check. *Practice, Civil,* Instructions to jury, Summary judgment. *Negotiable Instruments,* Payment. *Consumer Protection Act,* Bank, Unfair or deceptive act. *Contract,* Performance and breach.

In a civil action in which counterclaims alleged violations of the Uniform Commercial Code arising from a bank's handling of certain checks, the judge's instruction to the jury on bad faith was not limited to conscious and purposeful wrongdoing, but erroneously included elements of negligence, recklessness, and indifference to reasonable commercial standards; therefore, the instruction included a far broader basis for finding liability than allowed by Massachusetts law, and a new trial on the issue of bad faith was required. [753-759]

In a civil action in which counterclaims alleged violations of the Uniform Commercial Code arising from a bank's handling of certain checks, the bank was not entitled to judgment notwithstanding the verdict on claims that it wrongfully debited an account, where the judge properly instructed the jury on the issue, and where there was evidence from which the jury could conclude that the bank had not properly debited the checks at issue [759-761]; however, this court concluded that where the judge's instruction with regard to one category of checks (redeposit checks) erroneously allowed recovery of consequential damages for wrongful debits to the account independent of bad faith on the bank's part, the award of direct damages arising from the redeposit checks could not stand, and further, where every debit to the account produced by a redeposit check was accompanied by a simultaneous credit in like amount, the claim for direct damages arising from the redeposit checks should have been dismissed [761-766].

There was no merit to a claim that a summary judgment ruling precluded a jury's consideration of an issue at trial, where the summary judgment ruling was interlocutory in nature and was subject to revision at any time prior to entry of a final judgment. [766]

---

[1]The original plaintiff in this action was South Shore Bank. A motion to substitute Bank of America, N.A., was allowed in this court. Throughout our decision, we will refer to the original plaintiff, South Shore Bank.

[2]Helmut Schmidt and Renate Schmidt.

In a civil action arising from a loan agreement, the judge properly denied the plaintiff's request for fees and costs pursuant to the terms of a security agreement, where the plaintiff had no right to consider the defendant in default on the loan, which would trigger the entitlement to fees. [767]

This court declined to review a summary judgment order, where the claim of error arguably did not rise to the level of appellate argument, and where any doubts about the correctness of the summary judgment decision could be revisited on remand. [768]

In a civil action involving a bank's handling of certain checks, the judge properly concluded that the defendants, in their counterclaims, could not proceed under a theory of wrongful dishonor of those checks, where all of the checks were paid. [768-769]

In a civil action in which the judge reserved to himself the determination of counterclaims alleging violations of G. L. c. 93A arising from a bank's handling of certain checks, the judge was not bound by the jury's findings; further, the evidence warranted the judge's factual findings, even if it did not command them, and those findings compelled his conclusion that the bank did not violate G. L. c. 93A, § 11. [769-770]

In a civil action involving a bank's handling of certain checks, individuals who were not the bank's customers could not recover for the wrongful debiting of the customer's account. [770-771]

A Superior Court judge did not abuse his discretion in denying a civil litigant's motion to amend a complaint in counterclaim, where the motion was filed ten years after the counterclaim originally had been filed. [771]

CIVIL ACTION commenced in the Superior Court Department on February 1, 1991.

Motions for summary judgment were considered by *Elizabeth Butler*, J., and the case was tried on a bifurcated basis by *Paul A. Chernoff*, J., one trial to determine the issues, and a second trial to determine consequential damages.

*Gary R. Greenberg* (*Louis J. Scerra, Jr., & Peter Alley* with him) for the plaintiff.

*George C. Deptula* for the defendants.

McHUGH, J. Using a sophisticated and complex scheme, a thief named Wajahat Malick stole hundreds of thousands of dollars from his employer, Prestige Imports, Inc. (Prestige), a Weymouth automobile dealership. Essentially, the scheme involved Malick's manipulation of deposits Prestige intended to make to its accounts at South Shore Bank (SSB or the Bank). Discovery of the fraud produced a lengthy prison sentence for Malick and energized litigation between SSB, Prestige, Helmut Schmidt (Helmut), who owned Prestige, and his wife Renate Schmidt (Renate), both of whom had guaranteed SSB loans to Prestige.

The litigation stretched over twelve years, involved two jury trials, and is documented in numerous judicial orders, thousands of documents, and thousands of pages of trial transcript. Ultimately, three judgments entered. The first awarded SSB $1,049,000 on its claims against Prestige and the Schmidts. The second awarded $2,890,430 to Prestige on its counterclaims against SSB, and $1,049,000 to the Schmidts on their counterclaims, an amount which was designed to offset SSB's judgment against them. The third ruled against Prestige and the Schmidts on their G. L. c. 93A claim against SSB. All parties have appealed, citing numerous alleged errors. We affirm in part and reverse in part.[3]

## I. *BACKGROUND*

1. *The SSB-Prestige security agreement.* The relationship between Prestige and SSB began in February, 1977, when Prestige signed a loan and security agreement with the Bank, which Helmut and Renate guaranteed.[4] The agreement included a "floorplan loan" through which the Bank loaned Prestige money to purchase automobiles for resale. Under the agreement, the Bank took a security interest in each vehicle, and Prestige repaid the loan on each vehicle as it sold. Under the terms of the agreement, failure to pay the loan immediately following a sale would put Prestige "out of trust" and in default, at which time all obligations to the Bank would become due. SSB conducted monthly inventories of Prestige vehicles to confirm that its collateral was there.

---

[3]Counsel and the trial judge took several noteworthy steps to facilitate consideration of the appellate issues. The trial judge, who had been specially assigned to hear the case, carefully documented each of his decisions as pretrial and trial proceedings progressed. Then, when everything was finished, he created an extremely helpful memorandum describing the course of the litigation and reiterating in summary form the basis for key decisions he had made. For their part, trial counsel created a set of ten volumes of exhibits, fifteen volumes of transcript, and fifteen volumes of appendix materials. They consecutively paginated each set, and all briefs refer solely to the consecutive page numbers. Then, at the court's request, counsel delivered a CD-ROM containing all forty volumes of material in searchable PDF format. The electronic label for each volume includes the page numbers the volume contains.

[4]At the time, Helmut was a part owner of Prestige. He was involved in running the business, but Renate was not. In 1989, a co-owner decided to retire, and Helmut bought him out. Thereafter, Helmut was the sole owner and president.

2. *The embezzlement.* In April, 1987, Prestige hired Malick to be its comptroller. Malick's responsibilities included safeguarding the dealership's assets and overseeing its financial affairs. A document entitled "Corporate Deposit and Borrowing Resolutions," which Prestige delivered to SSB, gave Malick broad authority to sign checks and to engage in other financial transactions with SSB if his signature was accompanied by Helmut's or that of another designated Prestige employee. Soon after commencing his employment, Malick began to go to an SSB office on a daily basis to make deposits and conduct other Prestige business. As a result, SSB tellers and other employees got to know him well.

Almost immediately, Malick began to engage in two schemes that lie at the heart of this litigation.[5] The first was what the parties and the trial judge refer to as the "redeposit" scheme. We shall refer to it by the same name, although calling it the "nullity check" scheme would be equally descriptive. The scheme, which was designed to conceal Malick's theft of cash and third-party checks payable to Prestige, capitalized on the oral payoff system Prestige had used to pay down its floor-plan loan from the very beginning of the banking relationship with SSB.

Under the oral payoff system, Prestige's office manager would determine from time to time the identity of the vehicles Prestige had sold and the resulting amount due to SSB. She would then telephone an SSB employee with instructions to debit Prestige's checking account in the amount due. The SSB employee would make the debit, credit the amount debited to Prestige's loan account, and then confirm the transaction by sending Prestige a debit memo.

In 1989, Prestige began using a computer system to print a loan payoff check each time it sold a vehicle. Each check was payable to SSB and contained the vehicle's identification number plus various Prestige accounting numbers. Helmut signed all of the checks. Prestige received the cancelled payoff checks with its monthly bank statement and confirmed the payment on its books.

---

[5]Malick also engaged in other schemes, but they involved direct theft of money and automobiles from Prestige, did not involve SSB, and are not involved in this litigation.

Although Helmut intended the check system as a replacement for the oral payoff system, Malick kept the oral system in place. However, in order to avoid two payoffs for each vehicle, Malick instructed a Prestige employee to place an indorsement reading "for deposit only — Prestige Imports, Inc." on the reverse of each check, thus indicating that the payoff check should be deposited into Prestige's checking account, not debited to the checking account and credited to the loan account. Malick then delivered the checks to SSB with an itemized deposit slip marked "payoff" that the Prestige office manager had prepared.

Although SSB was the payee of the payoff checks and played no role in creating the indorsement, it routinely followed the indorsement's direction and credited the amount of each payoff check to Prestige's checking account, not to its loan account, which had already been credited pursuant to the office manager's oral instructions. Crediting, or "redepositing," the payoff check to Prestige's checking account meant that the transaction was a nullity, for SSB was simultaneously crediting and debiting in the same amount the account on which the check had been drawn.

By themselves, the redeposit transactions caused Prestige no harm. Because they were nullities, the transactions had no impact on Prestige's profits, losses, or cash flow, save perhaps for the cost of added time it may have taken to reconcile the monthly bank statements on which the transactions were reflected. Instead, the harm to Prestige flowed from the way the transactions facilitated and camouflaged Malick's theft of cash and checks Prestige received from third parties.

Malick's camouflaged thefts occurred in the following fashion. In addition to itemized "payoff" deposit slips covering the redeposit checks just described, Prestige routinely deposited to the same checking account cash and checks from third parties. The cash and third-party checks were covered by a separate deposit slip prepared by the office manager, which also specified each item in the deposit. These deposits were not nullities and were designed to increase Prestige's account balance by the deposit amount. On twenty-three occasions between November, 1989, and November, 1990, however, Malick took cash and checks from these deposits, replaced the cash and checks with redeposit checks of the type just described, and also replaced the itemized

deposit slip with an unitemized slip simply stating the total deposit amount. The total amount shown on the unitemized deposit slip, therefore, corresponded with the total amount stated on the office manager's deposit slip, although the net deposit was lower by the amount of cash or checks Malick pocketed and replaced with redeposit checks. The face amount of the redeposit checks Malick used in that scheme totaled $354,086.[6]

The scheme likely succeeded for as long as it did because it was difficult to detect solely on the basis of the monthly bank statements and because of the volume of checks involved. Between April and November, 1989, when Malick started using the scheme to steal, Prestige deposited approximately 300 of the redeposit checks to its account. When Malick saw that no eyebrows were raised despite the nonconforming indorsements on the checks, he began his theft. During the one-year period when the scheme was in effect, Malick deposited approximately 1,300 of the redeposit checks, the face amount of which was approximately $32 million.

The second scheme involved treasurer's checks and was more straightforward. On nine occasions between February and October, 1990, Malick presented SSB with Prestige "payoff" checks signed by Helmut ranging in amount from $24,377 to $59,980. In each instance, Malick asked for and received an SSB treasurer's check in the same amount payable to South Weymouth Savings Bank (South Weymouth), where he had a checking account and had obtained personal loans. Malick then deposited the SSB treasurer's checks in his South Weymouth account and either pocketed the proceeds or used them to pay down his personal loans. In all, this scheme netted Malick $432,895.

3. *The unraveling.* Prestige's financial statements showed a $632,000 loss for the year ending July 31, 1990. In addition, in early November, 1990, South Weymouth called Helmut to express concern about a $90,000 Prestige check made payable to Malick. Suspicions aroused, Helmut asked his accounting firm for advice. An accountant investigated the matter and told Hel-

---

[6]There is no evidence that Malick cashed the third-party checks he stole. Instead, he apparently substituted those checks for cash he stole from other deposits. Malick's theft of cash through manipulation of third-party checks began before he started to use the redeposit checks as cover for his scheme, but the earlier thefts are not at issue in this action.

mut that someone had made unusual adjustments to Prestige's records. He also advised Helmut not to allow Malick to continue his daily banking transactions and suggested that Malick might be stealing money. Despite this advice, Helmut did not fire Malick, change his duties, or remove him as signatory on an account Prestige had opened at another bank that November and utilized for used car transactions.[7]

Malick left Prestige in mid-December. On January 2, 1991, SSB conducted one of its periodic "floor plan audits" or inventories of Prestige vehicles and concluded that Prestige had sold sixty-seven vehicles, worth approximately $1.6 million, "out of trust," that is, without repayment to SSB of the loans Prestige had used to purchase the vehicles. SSB immediately defaulted Prestige on the security agreement and called the loan, the balance of which then approximated $7 million. SSB seized the money in Prestige's accounts, foreclosed on the dealership, and sold the loan collateral, including the dealership vehicles and the Schmidts' home. When all of the collections and sales were concluded, SSB was left with a $1,049,000 deficiency.

## II. *THE LITIGATION*

1. *Preliminaries.* On February 1, 1991, the Bank commenced this action against Prestige and the Schmidts to recover the deficiency on a variety of theories. Prestige and the Schmidts counterclaimed, chiefly alleging Uniform Commercial Code (U.C.C. or Code) violations, violation of G. L. c. 93A, and negligence, all arising out of SSB's handling of the redeposit checks and its issuance of the treasurer's checks.[8]

Discovery ensued, and ultimately a judge of the Superior Court considered the parties' cross motions for summary judgment.[9] Among other things, the judge concluded that, by Helmut's own admission, Prestige had been out of trust at times

---

[7]Ironically, Malick loaned Prestige $90,000 in October, 1990, and $35,000 in November of that year to deal with cash shortages his fraud had created.

[8]Prestige also filed a third-party claim against South Weymouth for its role in handling the SSB treasurer's checks. Summary judgment entered dismissing that claim. That judgment is the subject of a separate appeal. See *Prestige Imports, Inc.* v. *South Weymouth Savings Bank, post* 773 (2009).

[9]Years earlier, SSB had filed, and another Superior Court judge had denied without opinion, a different SSB summary judgment motion. Much discovery

during 1989 and 1990 because it sold vehicles without remitting payment to SSB.[10] She also concluded that Prestige's default triggered the Schmidts' guaranty. Finally, she concluded that Prestige had engaged in conversion when, in January, 1991, it deposited proceeds of automobile sales covered by the security agreement in an operating account it maintained at a Quincy bank. She left for trial the amount of SSB's deficiency, as well as the counterclaims Prestige had asserted as a result of Malick's schemes.

The case was then specially assigned to another judge for pretrial proceedings and for trial. The judge held a preliminary hearing, after which he took a number of actions that shaped the remaining course of the litigation. First, he confined Prestige's counterclaim to SSB's alleged wrongful debit of the Prestige account, a matter governed by G. L. c. 106, § 4-401,[11] and rejected as a matter of law Prestige's claim that SSB's actions with respect to the redeposit checks amounted to a wrongful dishonor of those checks governed by G. L. c. 106, § 4-402.[12]

Second, the judge reserved to himself trial of the defendants' G. L. c. 93A counterclaim against SSB. Finally, he bifurcated the trial. In the first phase, the jury were to determine all issues,

took place thereafter, and SSB renewed its motion, this time joined by the defendants' cross motions.

[10] In the process, the judge concluded that Prestige had "failed to adduce sufficient evidence establishing a genuine issue of material fact regarding the existence of a course of dealings of accepting late payments, specifically payments thirty to sixty days late."

[11] Because the transactions in question here took place in 1990, references to the Code are, unless otherwise noted, references to the version inserted by St. 1957, c. 765, § 1. That version replaced the Uniform Negotiable Instruments Law and remained in effect, with some amendments, until 1998, when Massachusetts adopted the 1990 Code revisions, which, with a few amendments, remain in effect today. See St. 1998, c. 24, § 8. Though not controlling here, the revisions adopted in 1998 and accompanying official comments are in some instances helpful to an understanding of the 1957 provisions. The revised version, when referred to, will be described as the "1998 U.C.C."

[12] Insofar as Prestige was concerned, the material difference between the two sections lay in their differing treatment of consequential damages. As the judge observed, because § 4-401 does not specifically provide for the remedy of consequential damages, such damages are recoverable only on proof of bad faith. See G. L. c. 106, § 4-103(5). Section 4-402, governing wrongful dishonor, contains no such limitation. The interplay between §§ 4-401 and 4-103 is discussed, *infra*, in part III.1.c.

including whether SSB had acted in bad faith, with the exception of any consequential damages attributable to bad faith. The judge's bifurcation decision was predicated on his belief that, with Prestige in ruins, a consequential damages trial was likely to be lengthy, complicated, and wholly unnecessary if a jury found that no bad faith had occurred.[13]

As they emerged from the preliminary hearing, the parties were divided, and the judge was uncertain, about the role negligence should play in assessing SSB's liability. Shortly after the hearing concluded, however, this court decided *Govoni & Sons Constr. Co.* v. *Mechanics Bank*, 51 Mass. App. Ct. 35 (2001), a case involving a fraudulent scheme with attributes similar to those at issue here. In essence, both Govoni & Sons (Govoni) and the thief, who was a Govoni employee, had accounts at Mechanics Bank. Periodically, Govoni drew checks on its own account for payment of taxes, some of which were payable to the Commonwealth of Massachusetts and some of which were payable to the bank, which was supposed to use the proceeds for payment of Govoni's Federal taxes. As to the latter checks, the bank was both the payee and the drawee. The thief delivered all of the tax payment checks to the bank but had the proceeds credited to his own account. *Id.* at 36-37.

For reasons discussed below, the court held that the bank was required to recredit Govoni's account for the amount of the checks payable to the bank that the bank had credited to the thief's account because those checks had not been "properly payable" from the Govoni account. *Id.* at 39-42. See G. L. c. 106, § 4-401. Significantly, however, the court said in a footnote that

> "[a] bank and its depositor are in the contractual relation of debtor and creditor, the terms of which are subject to Article 4 of the Uniform Commercial Code. The principles articulated in [Govoni's] common law claims for negligence and money had and received . . . are implicit in a § 4-401(1) claim that a drawee bank should be made to recredit the depositor's account with the amount of any

---

[13]The judge also denied as untimely Prestige's motion to amend the complaint to add a contract claim alleging SSB's breach of the depositary agreement between SSB and Prestige. Prestige had sought the amendment because of its view that the depositary agreement provided a vehicle for recovery for check mishandling wholly independent of the U.C.C.

unauthorized payment. *Stone & Webster Engr. Corp.* v. *First Natl. Bank & Trust Co.*, [345 Mass. 1,] 5, 9 [(1962)]."
*Id.* at 40 n.11.

In light of *Govoni,* the parties and the judge agreed that the judge should rule in advance of trial on several important issues, and that he would hold an evidentiary hearing to arm himself with the facts necessary to do so. The hearing was held, and the judge ruled, in material part, that (1) negligence provided a vehicle for recovery for check handling and processing only to the extent the U.C.C. expressly permitted, (2) if SSB honored an item that was not properly payable, comparative negligence on Prestige's part was not a defense to SSB's liability, (3) reaffirming his earlier ruling, Prestige's claims properly fell within G. L. c. 106, § 4-401, for wrongful debit, not G. L. c. 106, § 4-402, for wrongful dishonor, and consequential damages therefore were available only on proof of SSB's bad faith, (4) " '[b]ad faith' is an absence of 'good faith' combined with at least some quantum of scienter,"[14] and (5) as a consequence of (2), if a jury determined that SSB paid items that were not "properly payable," SSB was liable regardless of any lack of care on the part of Prestige with respect to supervising Malick or creating internal controls to prevent his fraud.

2. *The first trial and aftermath.* With those principles in place, the case proceeded to trial and the jury returned a verdict on special questions. See Mass.R.Civ.P. 49(a), 365 Mass. 813 (1974). First, it found that the amount of the deficiency on SSB's loan to Prestige was $1,049,000. Second, it found that SSB had wrongfully debited the redeposit checks to Prestige's account in violation of G. L. c. 106, § 4-401, causing Prestige $302,725 in "direct" damages.[15] Insofar as its handling of those checks was concerned, however, the jury found that SSB had not acted in

---

[14]The judge also said that "[a]t this juncture, the court is not prepared to declare that overt recklessness can establish scienter."

[15]As noted earlier, the total face amount of the twenty-three redeposit checks Malick used to conceal his theft of third-party funds was $354,086. The $51,361 difference between the face amount and the verdict is the amount of the last two checks Malick used in his scheme, both of which were deposited after South Weymouth had telephoned Prestige to inquire about a check Malick was attempting to deposit. The "direct" damage verdict is discussed *infra,* in part III.1.c.

bad faith. Third, the jury found that SSB wrongfully debited Prestige's account for the amount of the treasurer's checks and awarded $432,895, the face value of those checks, in direct damages. In connection with the treasurer's checks, the jury found SSB had acted in bad faith.[16]

3. *The second trial.* Under the terms of the pretrial order, the bad faith finding meant that a second trial would be required to assess consequential damages arising out of SSB's issuance of the treasurer's checks. The problem that quickly emerged was that the first jury had not been asked to determine whether the bad faith began with issuance of the first treasurer's check in February, 1990, with issuance of the last check in October, 1990, or somewhere in between. The date was important for determining the consequences of the bad faith and, therefore, the amount of recoverable damages.

In posttrial motions, Prestige urged that the jury actually had determined that SSB's bad faith began with the first check, and requested that the second jury be instructed accordingly. For its part, SSB urged that the bad faith finding be vacated and that the question of bad faith be presented to the second jury anew so that that jury could decide in a fully informed fashion when any bad faith had begun. The judge denied both requests, ruling instead that the first jury's bad faith finding would remain intact, but that the second jury would have the task of determining when bad faith had begun. Later, the judge informed counsel that the second jury would also be asked to determine whether, in light of SSB's bad faith, SSB had properly defaulted Prestige on its loan agreement and, if the default was improper, the amount of damages Prestige had suffered as a result.[17]

The second jury, too, were asked to render a verdict on special questions. In answering those questions, it found that SSB's bad

---

[16]In response to special questions, the jury also found that SSB failed to act fairly and in good faith with respect to the check processing agreement between SSB and Prestige and that SSB failed to act in a commercially reasonable manner with respect to processing both the redeposit checks and the treasurer's checks. The judge asked the questions for "informational" purposes in connection with the claim under G. L. c. 93A and did not ask the jury to make any damage award as a result of its answers.

[17]That question had been resolved adversely to Prestige in the earlier summary judgment decision, but in the ruling he made before the second trial began, the judge reopened the question. See note 36, *infra.*

752        75 Mass. App. Ct. 741 (2009)

Bank of America, N.A. *v.* Prestige Imports, Inc.

faith began when it issued the first treasurer's check on February 7, 1990. The jury determined that, as a consequence of the bad faith, Prestige suffered $254,810 in damages before January 2, 1991.[18] Finally, the jury found that SSB wrongfully defaulted Prestige on January 2, 1991, and that its bad faith with respect to issuance of the treasurer's checks caused Prestige an additional $1,900,000 in consequential damages after January 2, 1991.

Thereafter, the judge issued findings of fact and conclusions of law on the c. 93A claim. Finding as a fact, among other things, that "not one of the [SSB] tellers, nor any other bank employee, had even an inkling that Malick was engaged in an illegal undertaking," he ordered entry of judgment dismissing the claim.[19] On the jury verdicts, he ordered entry of judgment for SSB in the amount of $1,049,000 for the deficiency on the Prestige loan, for Prestige on the counterclaim in the amount of $2,890,430,[20] and for the Schmidts on their counterclaim in the amount of $1,049,000.[21]

### III. *THE APPEAL*

From those judgments, all parties have appealed. SSB raises six issues,[22] as do the defendants.[23] Some of the issues require more extended discussion than others. We treat them seriatim.

---

[18]That figure approximates the amount of cash the parties agreed Malick had taken from daily deposits after SSB issued the first of the treasurer's checks in February, 1990. The second jury also awarded $302,725 as consequential damages with respect to the redeposit checks, but the judge ruled that that award duplicated the $302,725 the first jury had awarded in direct damages, and he declined to include it in the ultimate judgment. Prestige has not urged here that that aspect of the judge's decision was erroneous.

[19]See discussion in part III.2.c., *infra.*

[20]The components of the judgment for Prestige are $302,725 in direct damages for the redeposit checks, $432,895 in direct damages for the treasurer's checks, $254,810 in consequential damages flowing from SSB's bad faith in issuing the treasurer's checks before SSB defaulted Prestige on January 2, 1991, and $1,900,000 in consequential damages flowing from issuance of the treasurer's checks thereafter.

[21]In doing so, the judge reasoned that, although Prestige, and not the Schmidts, suffered the consequential damages, the Schmidts were exposed to liability on their guaranty by the late discovery of Malick's fraud and were, therefore, entitled to an equitable setoff against their liability to its full extent.

[22]SSB argues that (1) its motion for judgment notwithstanding the verdict (judgment n.o.v.) or a new trial should have been granted on the bad faith issue, (2) judgment n.o.v. or a new trial should have been granted on Prestige's

1. *The SSB appeal.* a. *The instruction on bad faith.* The majority of the damages awarded to Prestige flow from the first jury's determination that SSB acted in bad faith when it gave Malick SSB treasurer's checks in exchange for Prestige payoff checks. SSB maintains that the trial judge's instruction on bad faith erroneously included elements of negligence, reckless conduct, and other factors that impermissibly diluted the showing Prestige was required to make in order to prove that SSB had acted in bad faith. We agree.

As noted earlier, "bad faith" is the gateway to the consequential damages that G. L. c. 106, § 4-103(5), creates.[24] The Code does not define "bad faith," though the official comment to § 4-103 states that "the connotation is the absence of good faith." Official Comment 6 to Uniform Commercial Code § 4-103, 2 U.L.A. 369 (Master ed. 2004) (revised art. 4). At the time of these transactions, "good faith" was defined subjectively in G. L. c. 106, § 1-201(19), as "honesty in fact in the conduct or trans-

---

"wrongful debit" claim regarding the redeposit checks, (3) judgment n.o.v. should have been granted on the claim involving the redeposit checks because there was no proof of direct damages, (4) judgment n.o.v. should have been granted as to all damages after January 2, 1991, because the court had earlier determined, on a motion for summary judgment, that SSB lawfully exercised its right to default Prestige, (5) SSB's rights were violated by allowing the second jury to determine when SSB's "bad faith" began, and (6) SSB should have been awarded its attorney's fees and costs under the security agreement and guaranty.

[23]The defendants maintain that (1) the summary judgment ruling should be reversed in its entirety, (2) the deficiency judgment was without foundation because, as the jury determined, SSB did not properly default Prestige, (3) the trial judge erred in his ruling that Prestige could not proceed under a theory of "wrongful dishonor" under G. L. c. 106, § 4-402, (4) the judge's findings and conclusions on the claim under G. L. c. 93A were wrong, (5) the Schmidts personally were harmed by the wrongful default and should have been permitted to recover their damages, and (6) Prestige and the Schmidts should be permitted to recover their losses based on breach of contract and violation of the implied covenant of good faith and fair dealing.

[24]General Laws c. 106, § 4-103(5), provides that

"[t]he measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any[,] suffered by the party as a proximate consequence."

See G. L. c. 106, § 4-103(*e*) (1998), which is almost identical.

action concerned."[25] Under Massachusetts interpretations of the term, there is "no element of due care in the concept of good faith. . . . Nor is there any requirement of commercial reasonableness." *McCarthy, Kenney & Reidy, P.C.* v. *First Natl. Bank of Boston*, 402 Mass. 630, 635 (1988).

Massachusetts law has consistently defined "bad faith" with a similar focus on the subjective, specifically on knowing and purposeful misbehavior. A foundational definition of the term appears in *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 416 (1937), where the Supreme Judicial Court stated that

" 'Bad faith' is a general and somewhat indefinite term. It has no constricted meaning. It cannot be defined with exactness. It is not simply bad judgment. It is not merely negligence. It imports a dishonest purpose or some moral obliquity. It implies conscious doing of wrong. It means a breach of a known duty through some motive of interest or ill will. It partakes of the nature of fraud. . . . It was said by Taft, J., in *Penn Mutual Life Ins. Co.* v. *Mechanics' Savings Bank & Trust Co.*, 73 Fed. 653, 654 [(6th Cir. 1896)]: ' "In bad faith" is not a technical term used only in actions for deceit. It is an ordinary expression, the meaning of which is not doubtful. It means "with actual intent to mislead or deceive another." It refers to a real and actual state of mind capable of both direct and circumstantial proof.' "

That focus on knowing and conscious wrongdoing lies at the heart of all subsequent uses of the term in our decisions. See,

---

[25]At the time of the transactions at issue here, the quoted definition applied to use of the term "good faith" in every article or section of the Code. The 1998 U.C.C., however, includes a revised definition of "good faith" applicable to negotiable instruments. As defined in G. L. c. 106, § 3-103(*a*)(4) (1998), "good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing," thus adding an objective component to the previously subjective definition. Nevertheless, even the expanded definition does not include negligence, for the official commentary says that "[a]lthough fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction." Official Comment 4 to Uniform Commercial Code § 3-103, 2 U.L.A. 37 (Master ed. 2004) (revised art. 3).

e.g., *Judge Rotenberg Educ. Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation (No. 1)*, 424 Mass. 430, 454 (1997), quoting from *Hartford Acc. & Indem. Co.* v. *Millis Roofing & Sheet Metal, Inc.*, 11 Mass. App. Ct. 998, 999-1000 (1981) (bad faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will"); *Pardo* v. *General Hosp. Corp.*, 446 Mass. 1, 12 n.24 (2006) (citing *Spiegel* v. *Beacon Participations, Inc.*, *supra*); *Parker* v. *D'Avolio*, 40 Mass. App. Ct. 394, 402-403 (1996) (same); *Equipment & Sys. for Indus., Inc.* v. *Northmeadows Constr. Co.*, 59 Mass. App. Ct. 931, 932 (2003). That subjective focus also informs decisions dealing with the covenant of good faith and fair dealing in the banking context. See, e.g., *Shawmut Bank, N.A.* v. *Wayman*, 34 Mass. App. Ct. 20, 25 (1993) ("[U]nder Massachusetts law, every contract contains an implied covenant of good faith. . . . In context, the duty of good faith would require that the bank be honest in its dealings with [a loan] guarantor and that it not purposefully injure her right to obtain the benefits of the contract").

Over SSB's objections, however, the judge's instructions ranged far beyond knowing and purposeful wrongdoing to include negligence, recklessness, and commercially unreasonable conduct.[26] The instruction was not limited to the conscious and purposeful

[26]Among other things, after stating that "bad faith requires more than a failure to act in good faith" and that violation of the contractual or legal duty to a customer was not enough to show that a bank had acted in bad faith, the judge instructed the jury that

"[b]ad faith may be evidenced by multiple violations of multiple duties or by single violations of multiple duties. You may consider whether questionable or irregular acts or omissions occurred on many occasions over a significant period of time and involv[ed] large sums of money. You may also consider whether there were circumstances that should have alerted a reasonably prudent bank person to the existence of an unlawful scheme or to a situation where it reasonably appeared that the bank's conduct would place an innocent customer at financial risk, where a failure to discover, inquire of, or rectify the situation would constitute a deliberate or reckless indifference.

"Not surprisingly, bad faith includes conduct that is immoral, deceptive, and knowingly harmful. It also includes intentional conduct where the actor actually knows that his or her acts are likely to place innocent persons at risk of harm, or where the actor should know that his or her acts are likely to place others at risk. Either situation constitutes deliberate

wrongdoing that Massachusetts requires for a finding of bad faith.

Prestige nevertheless finds support for the instructions in two Massachusetts cases and in a series of decisions in other States. Neither of the Massachusetts cases provides the support Prestige seeks. The first of the two is *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501 (1997), but the passage in the opinion Prestige pinpoints says that

> " '[g]ood faith' means 'honesty in fact in the conduct or transaction concerned.' G. L. c. 106, § 1-201(19). Good faith is to be determined by a subjective standard: what is required to establish good faith is an honest conviction or belief as to the legitimacy of the transaction, not the exercise of due care or the observance of reasonable commercial standards."

*Id.* at 547. The second case, *E.A. Miller, Inc.* v. *South Shore Bank*, 405 Mass. 95, 100 (1989), simply says that "[t]he essence of bad faith . . . is not the state of mind but rather the attendant bad actions," a statement that, in context, means that liability for bad faith does not flow from bad motives alone.

It is, therefore, cases from other jurisdictions to which Prestige must turn for the support it requires. Two of those cases are *Peregrine Homes, Inc.* v. *Jefferson Bank & Trust*, 713 P.2d 1342, 1344 (Colo. Ct. App. 1985), and *Glazer* v. *First Am. Natl. Bank*, 930 S.W.2d 546, 549-550 (Tenn. 1996), which relied on

---

or reckless indifference to the risk of others, — [and] may demonstrate bad faith on the part of the bank. This mental component to bad faith can be satisfied with proof of inappropriate intent or proof of facts that were known or reasonably knowable to the actor which would put the actor on reasonable notice of a risk of harm to others, so that essentially looking the other way constitutes the type of indifference that proves the existence of bad faith. Put another way, in order to find that the bank acted in bad faith, you must find that the bank exhibited some knowing behavior. This does not mean that the bank had to know or should have known of the check scheme. Intent and knowledge can be found where the bank either knew or should have known that its behavior was not within acceptable commercial standards and placed others at financial risk of harm by exhibiting deliberate or reckless indifference to the reasonable commercial standards. Hence bad faith can be inferred from a gross violation of a commercially reasonable practice where harm to others was reasonably foreseeable."

*Peregrine Homes.* Neither case provides support for the negligence components of the judge's instruction, and although both cases do discuss bad faith in terms of "knowing or reckless disregard of [a] customer's contractual rights," neither provides a persuasive basis for concluding that reckless conduct is the equivalent of conduct undertaken in bad faith.

First of all, the courts in both cases concluded that no bad faith, even when defined to include recklessness, had been shown. Moreover, *Peregrine Homes* was a very brief opinion containing no discussion of the basis for the court's conclusion that bad faith, as used in the Code, included reckless conduct. In *Glazer,* where the discussion was more extended, the plaintiff, who had prevailed in the trial court, relied on *Peregrine Homes* as he urged the court to affirm the judgment in his favor, because there was evidence that the bank had been reckless. The court, after observing that one of its earlier decisions equated bad faith with "dishonesty," said, in effect, that even when one construed bad faith to include recklessness, the judgment had to be reversed because the evidence did not show any violation of the plaintiff's contractual rights. The discussion of recklessness was, therefore, entirely dictum.

Two other cases on which Prestige relies are *Pavex, Inc.* v. *York Fed. Sav. & Loan Assn.,* 716 A.2d 640 (Pa. Super. Ct. 1998), and *Shearson Lehman Bros.* v. *Wasatch Bank,* 788 F. Supp. 1184 (D. Utah 1992). *Pavex, supra,* is a Pennsylvania Superior Court decision on an appeal from a decision of the Pennsylvania Court of Common Pleas. The Superior Court agreed with the lower court that "bad faith may properly be found where there has been either a gross violation of bank policies over an extended period and/or involving large sums, or a conscious and deliberate decision to ignore the existence of a fraudulent scheme." *Id.* at 646. In *Shearson, supra,* the court said that "absent some indication that the bank has acted in a subjectively dishonest or intentional manner in improperly accepting a check over a forged indorsement, the bank will be held to have acted in good faith." *Id.* at 1194. "Nevertheless," the court continued, "a bank's conscious and deliberate decision to remain ignorant of the existence of a fraudulent scheme despite irregularities on the face of a transaction can constitute bad faith." *Id.* at 1196.

The notion that bad faith may be shown by extended violations of bank policy or by violations of policy involving large sums of money finds no support whatsoever in Massachusetts law. On the other hand, although no Massachusetts case is directly on point, we think that a bank's conscious and deliberate decision to ignore a fraud being perpetrated on one of its customers fits within the concept of bad faith our prior cases have described. By making a conscious decision of that sort, a bank enables the theft and contributes to whatever damage to the customer results from the thief's activities. Here, however, the judge's instruction did not limit the concept of bad faith to conscious wrongdoing or a conscious and deliberate decision to ignore the existence of Malick's fraudulent scheme. Instead, the instruction included a far broader basis for finding liability.[27]

In sum, by including negligence, recklessness, and indifference to reasonable commercial standards, the judge's instruction on bad faith went beyond Massachusetts law and was improper. While some aspects of the instruction were properly limited, the charge as a whole permitted the jury to return a verdict based on an erroneous standard. "[W]e cannot say that the error was insubstantial or inconsequential." *Albee* v. *Glesmann*, 23 Mass. App.

---

[27]The remaining cases cited by Prestige do not help it, either. In *Reid* v. *Key Bank of S. Me., Inc.*, 821 F.2d 9, 15 n.2 (1st Cir. 1987), the court was applying Maine law and concluded that, although they had not yet done so, the Maine courts might well interpret "good faith" as used in U.C.C. § 1-203 to include an objective standard. Subsequently, however, the Maine Supreme Judicial Court ruled that "the [U.C.C.], § 1-203, impose[s] . . . a duty of good faith . . . requiring 'honesty in fact in the conduct or transaction concerned,' " a subjective standard. *Diversified Foods, Inc.* v. *First Natl. Bank of Boston*, 605 A.2d 609, 613 (Me. 1992). Moreover, the court in *Diversified Foods* went on to say as follows: "The Borrowers contend that the Banks were also subject to an objective 'good faith' duty to act in a commercially reasonable manner. The U.C.C. does impose the more onerous duty of objective good faith in certain situations. See §§ 2-103, 3-406, 3-419(3) and 9-318(2). The Borrowers contend that Article 4 extends such a duty to all bank activities. Article 4 does incorporate notions of 'ordinary care,' but is limited to issues of bank deposits and collections." *Id.* at 613. "The drafters of the [C]ode attempted to define the general good faith obligation of § 1-203 as honesty in fact and commercial reasonableness. Due to opposition from the [American Bar Association], the definition was modified to encompass only honesty in fact." *Id.* at 613 n.3. In *La Sara Grain Co.* v. *First Natl. Bank of Mercedes, Tex.*, 673 S.W.2d 558, 563 (Tex. 1984), the court said that the "test for good faith is the actual belief of the party in question, not the reasonableness of that belief."

Ct. 972, 975 (1987). Because there was, at the least, evidence from which a jury could have concluded that Bank officials remained consciously and deliberately indifferent to the fraud Malick perpetrated through use of the treasurer's checks, a new trial on the bad faith issue is required.

b. *Prestige's wrongful debit claims.* SSB next claims that it was entitled to judgment notwithstanding the verdict (judgment n.o.v.) on Prestige's wrongful debit claims because "no reasonable jury could find that [SSB] was not authorized by Malick's actual and apparent authority to process transactions as he instructed."

The wrongful debit claim is governed by G. L. c. 106, § 4-401(1), which provides that

> "[a]s against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft."[28]

The judge charged the jury that, in considering whether the twenty-three redeposit checks Malick used to camouflage his thefts from Prestige and the nine checks he used to procure SSB treasurer's checks were properly debited to Prestige's account, they were entitled to consider, among other things, whether SSB used due care, whether it reasonably failed to investigate or contact Prestige about the transactions, whether it violated its own internal policies and procedures, and whether it proceeded in a commercially reasonable fashion.

Those instructions were appropriate. Each of the twenty-three redeposit checks was payable to SSB, but it is undisputed that SSB credited the proceeds of those checks, along with hundreds of others, to Prestige's account, not its own. There was abundant evidence that SSB did so pursuant to the indorsement on the back of each check (an indorsement that was improper because it was not made by SSB, the payee), or pursuant to instructions provided by Malick, or both. SSB's expert witness testified that the transactions were "very unusual." SSB's head teller testified that Bank policy required tellers to refer customers to an officer if

---

[28]The 1998 U.C.C. is similar but adds that "[a]n item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." G. L. c. 106, § 4-401(*a*) (1998).

they sought to deposit checks payable to SSB into a non-SSB account. She also testified that if SSB accepted a check payable to its order, Bank policy required that it place a stamp on the face of the check showing how it had used the proceeds, but many of the redeposit checks contained no such stamp. Finally, she testified that SSB customers had the right to expect that SSB would "be careful with processing of a check to make sure that the legitimately named payee of the check got the benefit of those funds." There was evidence, in sum, from which a jury could conclude that the redeposit checks were not properly debited to the Prestige account, although as we discuss in the next section, damages for those improper debits presents a different set of issues.

The nine checks Malick fraudulently used to procure the treasurer's checks showed on their face that they were "payoff" checks, i.e., checks evidencing payment due to SSB on an automobile Prestige had sold. From the evidence, a jury could conclude that those payoff checks either should have been deposited in Prestige's checking account in accordance with the practice that had developed with respect to "redepositing" the other payoff checks, or that SSB should have used the proceeds to reduce Prestige's loan balance, but that it had no authority to take the payoff checks in payment of the treasurer's checks it gave Malick.

That evidence notwithstanding, SSB claims that Prestige routinely procured treasurer's checks from SSB to use for a variety of purposes, and that nothing about Malick's procurement of the nine treasurer's checks should have alerted anyone at SSB that Malick was engaged in fraudulent activity when he obtained the nine checks he used to fund his scheme. SSB's argument, however, overlooks evidence that the nine treasurer's checks were the only treasurer's checks Prestige ever obtained with payoff checks. Prestige paid for all other treasurer's checks with regular checks drawn on its account. Moreover, SSB's claim overlooks evidence that, when purchasing a treasurer's check, Prestige normally tendered to SSB a Prestige check payable to "SSB or [the intended payee of the treasurer's check]" and obtained in return a treasurer's check payable to the intended payee alone. Finally, SSB's claim overlooks evidence that actually debiting the Prestige checking account for the amount of the payoff check meant that SSB was

debiting the checking account twice on account of a payment purporting to flow from sale of a single automobile — once to pay the loan account pursuant to the office managers's telephone call and once to issue the treasurer's check. In the context of that evidence, a jury could conclude that SSB did not properly debit Prestige's account for the amount of the payoff checks used to procure treasurer's checks.

There was, of course, contrary evidence and evidence as to why SSB rules and procedures were not followed with respect to the checks in question, but that contrary evidence is what created an issue for the jury. In any event, there was no error in the denial of SSB's motion for a directed verdict or, later, for judgment n.o.v.

c. *"Direct" damages for the redeposit checks.* The "direct damages" to Prestige resulting from SSB's issuance of the treasurer's checks was the face value of those checks, for that is the value of the redeposit checks SSB debited Prestige's account to pay for the treasurer's checks. Insofar as the other redeposit checks were concerned, however, the judge instructed the jury as follows:

> "If you find that there was a wrongful debit as to one or more of these re-deposit checks, then you must determine whether or not damages were directly incurred by Prestige. Since the debit and credits canceled one another out, you must determine whether the depositing of some or all of these checks directly facilitated an embezzlement [of] the deposits by Malick. If so, then you may assess the causal connection between the wrongful debit and the enablement of the controller, Malick, to embezzle monies from batches of items that were offered for deposit.

> "If a finding of wrongful debit as to the redeposit checks is based on the lack of due care by the bank, then the damages start to accrue with the date of the breach of the duty of due care. Damages here may not exceed the sum of three hundred and fifty-four thousand dollars, the amount allegedly pilfered from the batches of deposits by Malick."

In other words, the jury could award "direct damages" if SSB's wrongful debiting of a redeposit check enabled Malick to steal

cash or third-party checks from Prestige. In response to those instructions, the jury awarded Prestige the sum of $302,725.[29]

SSB maintains that the judge's instruction was wrong and that, insofar as any wrongful debits to the Prestige account arose out of the redeposit scheme, there were no direct damages because any amount improperly debited was simultaneously offset by an equal credit, resulting in a transaction in which there was no net credit and no net debit. We agree, for the evidence is undisputed that SSB's acceptance of the redeposit checks, except for the nine checks used to procure treasurer's checks, resulted in a simultaneous debit and credit to Prestige's account in equal amounts. Accordingly, each transaction was a nullity, without a gain and without a loss.

Both the instruction and the resulting damage award appear to have proceeded on the premise that "direct damages" for mishandling an item include recovery for any damage "causally connected" to the mishandling, at least when the mishandling amounts to negligence. That premise appears to have been based on G. L. c. 106, § 4-103(5), and on our decision in *Govoni*. However, neither the statute nor *Govoni* supports the premise, and it is inconsistent with the Code's general loss-allocation structure.

Dealing first with the statute, G. L. c. 106, § 4-103(5), as noted earlier, provides that

> "[t]he measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any[,] suffered by the party as a proximate consequence."

Absent bad faith, then, the statutory measure of damages for negligent handling of an item, whether by negligently debiting the item to a customer's account or otherwise, focuses on the proceeds of the item itself, not on the extra-item consequences of the negligent mishandling. To drive that point home, the official commentary says that, "[i]n the absence of bad faith[,] the maximum recovery is the amount of the item concerned. When it is established that some part or all of the item could not have been

---

[29]For the source of that amount, see note 15, *supra*.

collected even by the use of ordinary care the recovery is reduced by the amount which would have been in any event uncollectible." Official Comment 6 to Uniform Commercial Code § 4-103, 2B part 1 U.L.A. 152 (Master ed. 2002) (prior art. 4).

*Govoni* does not support the premise either. Instead, we held in *Govoni* that "a claim for wrongful debit of items not properly payable under G. L. c. 106, § 4-401, is one of strict liability." *Govoni*, 51 Mass. App. Ct. at 48.[30] As observed earlier, § 4-401(1) only permits a bank to charge a customer's account for items that are "properly payable from that account."[31] Inquiries into the proximate consequences of negligence, therefore, do not inform the amount of recoverable damages, the amount of which is always the amount of the wrongful debit. See *Govoni*, *supra* at 40 n.11, 51; 6A Hawkland & Lawrence, Uniform Commercial Code Series § 4-401:1, at 306 (rev. art. 4) (1999) (Where the bank pays an item that is not "properly payable," proof of actual damages is irrelevant; "[b]ecause the item is not properly payable, the bank simply has no right to charge the customer's account").[32]

Measuring direct damages under § 4-401 by the amount of

---

[30]To be sure, there was an extensive discussion of negligence in *Govoni*, but that discussion occurred as the court explained why the bank's negligence deprived it of certain Code-based defenses to liability. That discussion, in turn, was entirely hypothetical, for the court explained that some of the defenses were inapplicable by their terms, some were inapplicable because the bank was on notice of adverse claims to the checks, and the remainder were inapplicable because of the strict liability concepts § 4-401 embodied. 51 Mass. App. Ct. at 44-49.

[31]Unlike the Code applicable to this case, which simply states that the term "properly payable" "includes the availability of funds for payment at the time of decision to pay or dishonor," G. L. c. 106, § 4-401(1)(*i*), § 4-401(*a*) of the 1998 U.C.C. explicitly defines the circumstances under which an item is "properly payable." See note 28, *supra*. The definition, however, is essentially a restatement of existing law rather than a change in its content. See generally *Torrance Natl. Bank* v. *Enesco Fed. Credit Union*, 134 Cal. App. 2d 316 (1955), cited in Official Comment 1 to Uniform Commercial Code § 4-401, 2 U.L.A. 412-413 (revised art. 4); 6A Hawkland & Lawrence, Uniform Commercial Code Series § 4-401:1, at 304-306 (rev. art. 4) (1999).

[32]In a memorandum and order disposing of motions filed after the first trial, the trial judge observed that

"[a]rguably, since each one of the 1300 [redeposit] checks was a nullity, there were no direct damages under the [U.C.C.] § 4-103 which, absent bad faith, caps damages at the 'amount of the item.' The jury

the wrongful debit does not run afoul of other Code provisions. It is true that G. L. c. 106, §§ 1-102(3)[33] and 4-103(1),[34] prohibit banks from disclaiming their duties of good faith and ordinary care. The effect of those provisions, as noted in the official commentary, is that, when processing negotiable instruments, "banks come under the general obligations of the use of good faith and the exercise of ordinary care." Official Comment 4 to Uniform Commercial Code § 4-103, 2B part 1 U.L.A. 151 (prior art. 4). It is also true that G. L. c. 106, § 1-103, provides that "[u]nless displaced by the particular provisions of . . . chapter [106], the principles of law and equity . . . shall supplement [the Code's] provisions."

Those provisions of the Code, however, do not permit a free-ranging application of common-law damage principles, because the Code itself contains a carefully constructed scheme for allocating losses produced by a violation either of the Code or of a supplementary duty supplied by common law. As just discussed, wrongful debiting of a customer's account requires the bank to credit the account in the amount of the wrongful debit. The

was permitted to assess damages one small step removed, to wit, the amount of the item pilfered from the batch deposit through the substitution of a re-deposit check."

The jury, however, appear to have concluded that if they determined that a redeposit check allowed Malick to steal cash and third-party checks, they were to award as damages the face amount of the redeposited check, thus effectively requiring a recredit of the debit side of what had been a nullity transaction. In any event, that "one small step" is the difference between the damages that § 4-103(5) permits on proof of negligence, see note 24, *supra*, and those it does not.

[33]General Laws c. 106, § 1-102(3), provides that

"[t]he effect of provisions of this chapter may be varied by agreement, except as otherwise provided in this chapter and except that the obligations of good faith, diligence, reasonableness and care prescribed by this chapter may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable."

[34]General Laws c. 106, § 4-103(1), states in relevant part that

"[t]he effect of the provisions of this Article may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure."

remedy, therefore, is one of strict liability. Where negligent handling of an item is concerned, recoverable damages are generally limited to the difference between the total amount of the item and the amount of the loss that could not be avoided by use of ordinary care. See G. L. c. 106, § 4-103(5). An exception to that general rule exists when a bank wrongfully dishonors an item, in which case the "bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item," G. L. c. 106, § 4-402, and the same rule applies to damages caused by bad faith conduct. G. L. c. 106, § 4-103(5). Finally, losses flowing from check forgery have their own loss allocation provisions. See G. L. c. 106, §§ 3-405, 3-417, 3-418, 4-207, 4-401(2)(*a*), 4-406[35]; *McCarthy, Kenney & Reidy, P.C.* v. *First Natl. Bank of Boston*, 402 Mass. at 633-635.

In sum, where the Code contains specific loss allocation provisions, those provisions, not common-law damage principles, apply to losses arising from a bank's failure to process checks in the manner the Code requires. See *Siegel* v. *New England Merchs. Natl. Bank*, 386 Mass. 672, 675-676 (1982); Hull, Common Law Negligence & Check Fraud Loss Allocation: Has Common Law Supplemented or Supplanted the U.C.C.?, 51 Ohio St. L.J. 605, 616-617 (1990). Under the Code, the loss allocation rule applicable to items that are "not 'properly payable,' from [a customer's] account, [is that the customer] is entitled to a recredit of [the amount improperly paid] to his account for a violation of § [4-401] by [the bank], and if [the bank] acted in bad faith, consequential damages are likewise allowed." *AmSouth Bank, N.A.* v. *Spigener*, 505 So. 2d 1030, 1033 (Ala. 1986).

Because the judge's instruction in the first trial allowed recovery of consequential damages for wrongful debits to the Prestige account independent of bad faith, the resulting award of $302,725 to Prestige cannot stand. Moreover, because the evidence established that every debit to the Prestige account produced by a redeposit check, except for the debits to pay for the treasurer's checks, was accompanied by a simultaneous credit in like amount, the credits that might otherwise be available under G. L. c. 106,

---

[35]A comparable set of loss allocation provisions appears in the 1998 U.C.C. See G. L. c. 106, §§ 3-403, 3-404, 3-405, 3-416, 3-417, 4-103(*e*), 4-207, 4-401, 4-402 (1998).

§ 4-401, have already occurred, and no further recovery for direct damage is available. The claim for direct damages for the redeposit checks should have been dismissed.

d. *Remaining claims.* Because the overbroad instruction on bad faith requires a retrial on the issue of bad faith and its consequences, the remaining issues raised by SSB can be dealt with in summary fashion, and the new trial will provide an opportunity for a reformatted proceeding that will likely eliminate their recurrence.

To begin, SSB claims that Prestige cannot recover damages incurred after January 2, 1991, which the second jury determined to be $1,900,000, because those damages are predicated on a finding that SSB wrongfully defaulted Prestige on January 2. However, SSB argues, the propriety of the default was resolved in SSB's favor in the court's earlier summary judgment ruling that the default was proper. Without "a certificate conforming to the requirements of rule 54(b), [however,] an order for partial summary judgment is not a judgment, but merely an order for judgment, interlocutory in nature, subject to revision at any time by the trial court prior to the entry of a judgment disposing of all claims against all parties to the action." *Acme Engr. & Mfg. Corp.* v. *Airadyne Co.*, 9 Mass. App. Ct. 762, 764 (1980). The first jury's bad faith determination created a genuine issue of material fact regarding the propriety of the default, even if no disputed fact had earlier appeared on the summary judgment record. To the extent that SSB claims prejudice from the timing of the judge's notice of his intent to reopen issues surrounding the propriety of the default, it does not appear that SSB objected on that ground or sought a continuance so that it could prepare.[36] In any event, timing will be no issue on retrial.

---

[36]Shortly before the second jury were impaneled, the judge met with counsel to deal with a variety of matters likely to arise as the trial proceeded. During a discussion with counsel for SSB about the anticipated consequential damages evidence, the judge asked whether there would have been a default in January, 1991, if Malick's scheme had been stopped in February, 1990, a few months after his fraud began. From that question grew an extended discussion whether the propriety of the default had been established by the summary judgment motion and no longer remained an open issue in the case. The discussion persisted through counsel's opening statements and into the fourth day of trial, when the judge instructed the jury that the propriety of the default was an issue they would have to consider, depending on how they resolved issues regarding when SSB's bad faith began. Counsel for SSB objected to

SSB's claim that the judge erred by allowing the second jury to determine the starting point and consequences of what the first jury had determined to be SSB's bad faith presents troublesome issues, although the problem was engendered by counsel's failure to include questions in the special verdict given to the first jury that would have given the second jury a firmer footing for its assessment of consequences. See generally Mass.R.Civ.P. 49(a), 365 Mass. 813 (1974). In any event, as bad faith itself must be redetermined, the problem can be resolved on retrial.

Finally, SSB contends that it should have been awarded its fees and costs pursuant to the terms of the security agreement. The trial judge concluded that, although both the security agreement and the guaranty provided for attorney's fees, SSB was not entitled to those fees because, when the action finally concluded, SSB was not the "prevailing party," as the amount of its recovery was less than the amount of the defendants' recovery and the second jury determined that the default was wrongful. Though inquiry into whether the fee applicant was the "prevailing party" usually occurs in cases involving statutory, not contractual, fee awards, see, e.g., *Mancuso* v. *Massachusetts Interscholastic Athletic Assn.*, 453 Mass. 116, 130 n.27 (2009); *Nogeiro* v. *Commissioner of the Dept. of Transitional Assistance*, 72 Mass. App. Ct. 496 (2008), the principle is essentially the same here. When the litigation ended, the jury found that SSB had no right to default Prestige. Default was the trigger for entitlement to fees under the loan agreement as well as to the collateral and to the deficiency judgment.[37] The judge, therefore, rightly rejected SSB's fee request.

reopening the issue but did not claim prejudice from the judge's timing, and the issue was fully tried.

[37]Upon return of the second jury's verdict that SSB had wrongly defaulted Prestige, the judge could have vacated the deficiency judgment the first jury had awarded. The second jury, however, knew of the deficiency judgment at the time it calculated the bad faith consequential damages, so vacation of the deficiency judgment would have called for some adjustment of the consequential damages award. The extent of the adjustment, however, was not self-evident, for the jury's calculation methods did not appear on the record. The judge, therefore, rightly left both the deficiency and the bad faith damage awards in place. Doing so did not alter the jury's finding that the default was improper. The first jury's finding of bad faith triggered the inquiry into the propriety of SSB's default of Prestige. Because we are vacating the judgment as to bad faith, we are leaving the deficiency judgment in place. The process used by

2. *The cross appeals.* The foregoing discussion implicitly resolves several of the issues the defendants raise in their cross appeals. Several issues nevertheless remain, and we discuss them seriatim.

a. *The summary judgment order.* The partial summary judgment order was entered in this case after an extended period of discovery but before two extended jury trials. The defendants would have us review the summary judgment order, consisting of thirty-six carefully crafted pages, and determine whether it should be vacated in its entirety. Apart from pointing to a few pages of trial transcript, the defendants provide no guidance as to where we should look for errors in the motion judge's work.

We doubt that the defendants' claims regarding the propriety of the summary judgment rise to the level of appellate argument. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). In any event, we decline to embark on the broad exploratory mission the defendants propose. As noted earlier, until entry of final judgment, a summary judgment order is interlocutory. On remand, the defendants can point with precision to any portion of the trial record that they contend raises doubt about the correctness of the summary judgment order, and if the information in that portion of the record was unavailable to them at the time of the summary judgment hearing, the Superior Court judge can determine whether, and to what extent, an issue purportedly foreclosed by the summary judgment should be reopened.

b. *Wrongful dishonor.* Next, the defendants assert that they should have been allowed to proceed under a theory of wrongful dishonor under G. L. c. 106, § 4-402, with respect to the re-deposit checks, rather than being limited to a theory of wrongful debit under § 4-401. The difference is important because liability for wrongful dishonor allows recovery of consequential damages without proof of bad faith.

The problem, as the trial judge observed, is that all of the re-deposit checks were paid, not dishonored. True, they were paid to Prestige, not to SSB, the payee, but they were paid nonetheless. Moreover, the term "dishonor" as used in the Code means a specified set of activities, none of which includes the behavior

the trial judge in entering judgment after the second jury's verdict here can be utilized on remand if bad faith again is found and bad faith damages again are awarded.

that occurred here. See G. L. c. 106, § 3-507. See also G. L. c. 106, §§ 3-501, 3-511.[38]

c. *Liability under G. L. c. 93A.* Next, the defendants maintain not only that the trial judge's decision on their claim under G. L. c. 93A was wrong but also that, as a matter of law, he should have ruled in their favor. In making that assertion, they point to the fact that the first jury found that SSB failed to conform to the covenant of good faith and fair dealing with respect to the check processing agreement between itself and Prestige and failed to act in a commercially reasonable manner regarding both the treasurer's and the redeposit checks.

The trial judge, however, was not bound by what the jury found. He reserved the c. 93A claim to himself at the start of the proceedings and was free to make his own factual findings. See, e.g., *Wyler* v. *Bonnel Motors, Inc.*, 35 Mass. App. Ct. 563, 567 (1993) ("a judge may make independent and, therefore, different findings on the c. 93A aspect of a case that arises out of the same facts which gave rise to parallel common law claims"). The judge found that SSB had been negligent on multiple occasions and in multiple ways. But he specifically disagreed with the jury's finding on the issue of the covenant of good faith and fair dealing. Equally important, he also specifically found that "not one of the tellers, nor any other bank employee, had even an inkling that Malick was engaged in an illegal undertaking." Moreover, "each [SSB] employee personally acted with honesty in fact[,] and . . . the tellers' relaxed compliance with the strict letter of certain rules was in accordance with another [SSB] rule, that essentially allowed the teller to for[]go banking formalities for customers doing banking business who are well known to [SSB] personnel, as was Malick." As to the default and foreclosure, he found that "[o]nly with the benefit of hindsight could one argue that [SSB] unfairly defaulted Prestige on January 2, 1991 in violation of the Consumer Protection Law. From [SSB's] perspective, its actions were warranted because the available financial data showed Prestige to be significantly out of trust on that date. Prestige did not inform [SSB] of Malick's embezzlements at that time, and hence [SSB] had no reason to look within and determine

---

[38]Comparable provisions appear in §§ 3-501 through 3-504 of the 1998 U.C.C.

whether it in any way had facilitated the embezzlement schemes and helped cause the impending financial crises."

There is an ample basis in the evidence for those findings, and they warrant the judge's conclusion that, whatever else SSB may have done, it did not violate G. L. c. 93A, § 11, the provision of c. 93A under which Prestige and the Schmidts proceeded.[39] A "breach of a legal obligation under commercial law, without more, does not amount to an unfair or deceptive act under G. L. c. 93A." *Framingham Auto Sales, Inc.* v. *Workers' Credit Union*, 41 Mass. App. Ct. 416, 418 (1996). Instead, to determine whether conduct is unfair or deceptive under c. 93A, we ask whether that conduct "lies 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness; . . . whether it is immoral, unethical, oppressive, or unscrupulous; [and] . . . whether it causes substantial injury to consumers[,] competitors[,] or other business [entities].' " *Renovator's Supply, Inc.* v. *Sovereign Bank*, 72 Mass. App. Ct. 419, 429 (2008), quoting from *PMP Assocs.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). That the Bank may have bent or broken its own rules in an effort to provide what it thought was assistance to Prestige does not compel a different result. Cf. *Shearson Lehman Bros., Inc.* v. *Wasatch Bank*, 788 F. Supp. 1184, 1196 (D. Utah 1992) ("Absent some evidence of a more pernicious motive, merely treating valued customers as such by allowing them special privileges not afforded to others will not be construed as commercial bad faith"). In all, the judge's factual findings were warranted, though surely not commanded, by the evidence, and his findings compelled the judgment dismissing the claim under c. 93A.

*d. Recovery by the Schmidts.* Individually, the Schmidts claim that they personally are entitled to recover for SSB's wrongful debit of the various checks the litigation involved.[40] Section

---

[39]Section 11, inserted by St. 1972, c. 614, § 2, grants a right of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by [G. L. c. 93A, § 2] . . . ."

[40]This claim is over and above the $1,049,000 the Schmidts, in their capacity as guarantors, were awarded as an offset to the deficiency judgment in favor of SSB. See note 21, *supra.*

4-401 of the Code, however, says that "[a]s against its customer, a bank may charge against his account any item which is otherwise properly payable," and as the case was tried, SSB's liability hinged on violation of that provision. Prestige, not the Schmidts, was the SSB "customer" whose account was debited. See *Kesner* v. *Liberty Bank & Trust Co.*, 7 Mass. App. Ct. 934, 935 (1979). The Schmidts suggest that the distinction between them and Prestige was a technicality the court should have ignored because "Prestige had no viability as a separate and distinct legal entity apart from Schmidt." It is sufficient to note, however, that the corporate form will not be ignored at the instance of one who created it. See *Gurry* v. *Cumberland Farms, Inc.*, 406 Mass. 615, 626 (1990).

e. *Breach of contract.* Finally, Prestige maintains that it should have been permitted to proceed on a breach of contract theory as well as theories arising out of the U.C.C. As originally drawn, the counterclaim included a count for violation of the covenant of good faith and fair dealing. About ten years after the counterclaim was filed and after a trial had been scheduled, Prestige sought to amend the counterclaim to include a claim for breach of contract. The trial judge denied the motion as untimely and prejudicial to SSB. We upset such decisions only if there is an abuse of discretion. *Mathis* v. *Massachusetts Elec. Co.*, 409 Mass. 256, 264 (1991) ("decision whether to grant a motion to amend is within the discretion of the judge, but leave should be granted unless there are good reasons for denying the motion"). The judge could permissibly find that waiting for ten years to move to amend a complaint to assert a new claim for relief was a "good reason" to deny the motion. There was no abuse of discretion.[41]

---

[41]We see no merit to Prestige's claim that it was grossly undercompensated by the amount of the second jury's verdict and that that verdict was strongly against the weight of the evidence. The evidence permitted the jury to award more, but it did not require them to do so, and as with most of the issues in this highly contested case, the jurors had to make a host of credibility determinations en route to any verdict. To the extent that Prestige claims it was handicapped by late disclosure of the opinion of SSB's expert, it is sufficient to note that the problem will be cured on retrial and that the timing of the disclosure was no doubt a product, at least in part, of the time when the issue of postdefault damages became a live one. See note 36, *supra.*

## IV. *CONCLUSION*

In light of the foregoing, there was no error in the deficiency judgment of $1,049,000 in favor of SSB, although on retrial that judgment may be offset if there is a finding that the default was a consequence of any bad faith on SSB's part with respect to the treasurer's checks. Likewise, there was no error in the first jury's award of $432,895 to Prestige for direct damages on the treasurer's checks. And there was no error in the judgment dismissing the claim against SSB under G. L. c. 93A.

Insofar as the redeposit checks are concerned, the Code, as a matter of law, leaves no room for the theory the defendants advance for recovery of what they claim were "direct damages" flowing from SSB's handling of the redeposit checks. Moreover, because Prestige's claim of bad faith with respect to the redeposit checks was resolved by the jury against Prestige under instructions more favorable to Prestige than Prestige was entitled to receive, that aspect of the bad faith claim may not be retried. The claims based on the redeposit checks, therefore, must be dismissed.

In all other respects, however, the judgments stem from the error in the instruction on bad faith. Whether SSB engaged in bad faith as to the treasurer's checks, and, if so, the consequences that flowed therefrom, are issues that must be retried.

The judgment on the G. L. c. 93A claim and the amended judgment on the case in chief are affirmed. Insofar as the amended judgment on the counterclaim awards Prestige the sum of $432,895 in direct damages for the treasurer's checks, the judgment is affirmed. Insofar as the amended judgment on the counterclaim awards Prestige the sum of $302,725 in damages for the "redeposit" checks, the judgment is reversed and the claim is dismissed. The balance of the amended judgment on the counterclaim is vacated, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*