NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-248                                         Appeals Court

  BANK OF AMERICA, N.A.[1]  vs.  PRESTIGE IMPORTS, INC., & others.[2]


No. 15-P-248.

Norfolk.     January 11, 2016. - July 20, 2016.

Present:  Grainger, Rubin, & Milkey, JJ.


Attorney at Law, Attorney-client relationship, Lien, Contingent
     fee agreement, Withdrawal.  Damages, Quantum meruit.


     Civil action commenced in the Superior Court Department on
February 1, 1991.

     A motion to adjudicate an attorney's lien, filed on
December 9, 2013, was heard by Patrick F. Brady, J.

     Steven J. Bolotin for George Deptula.
     Timothy J. Fazio (Jennifer L. Morse with him) for the
defendants.


     RUBIN, J.  In 1992, attorney George Deptula agreed to

represent Prestige Imports, Inc., and its principals, Helmut

_____

     [1] The original plaintiff in this action was South Shore
Bank.  A motion to substitute Bank of America, N.A., was allowed
in this court.

     [2] Helmut Schmidt and Renate Schmidt.

Schmidt and his wife Renate Schmidt[3] (collectively, Prestige), on

a contingent fee basis in litigation with South Shore Bank and,

later, its acquirer, Bank of America, N.A. (Bank of America), in

exchange for a nonrefundable retainer and a percentage of any

recovery on Prestige's counterclaims.[4]  After victories at two

trials and a reversal of those victories by this court, see Bank

of America, N.A. v. Prestige Imports, Inc., 75 Mass. App. Ct.

741 (2009) (Prestige Imports), Deptula withdrew from the case

without Prestige's consent in April, 2010.  Represented by

different counsel, Prestige won a judgment of $27,031,568.12,

including statutory interest, at a third trial.  While that

judgment was on appeal at this court, Deptula filed a notice of

attorney's fees lien pursuant to G. L. c. 221, § 50.  Prestige

brought a motion to adjudicate this lien, arguing that Deptula

forfeited it by withdrawing without Prestige's consent and

without good cause.  After a jury-waived trial, a Superior Court

judge -- who was also the trial judge for the third trial in the

underlying litigation -- ordered the entry of judgment for

---

[3] Because Renate Schmidt does not play any role in the facts relevant to this dispute, we will follow the parties and the judge below in referring to Helmut as "Schmidt."

[4] Although the 1992 fee agreement was revised during the course of the representation, there always was a significant contingent component.  Specifically, the April, 1992, and October, 1999, versions of the fee agreement both provided that Deptula would receive fifteen percent of the first $1.5 million recovered, twenty percent of the next $1.5 million, and twenty-five percent of any balance more than $3 million.

Prestige. Deptula appealed that judgment and, for the reasons stated infra, we reverse.

Background. The litigation between Bank of America and Prestige involved claims by Bank of America for repayment of loans, and counterclaims by Prestige chiefly alleging Uniform Commercial Code violations, violation of G. L. c. 93A, and negligence, arising out of Bank of America's handling of certain checks and its issuance of treasurer's checks by which the comptroller of Prestige embezzled substantial funds from Prestige. Detailed facts about that litigation are set forth in Prestige Imports, supra at 742-752. We summarize here only the facts relevant to the attorney-client relationship between Deptula and Prestige. We take the facts as found by the judge, supplemented by uncontested facts in the record. Denver St. LLC v. Saugus, 462 Mass. 651, 653 (2012).

After Deptula agreed to represent Prestige in April of 1992, he spent nine years conducting extensive discovery and opposing two motions for summary judgment filed by Bank of America. In 2001, Deptula asked Schmidt to allow him to bring in an attorney named Richard Grahn to help him try the case. Deptula proposed that Grahn would be compensated by sharing the contingent fee. Schmidt agreed to hire another attorney, but did not hire Grahn. Instead, he hired an attorney of his own choosing, Thomas Francis, whom Schmidt arranged to pay on an

hourly basis.  In 2002 and 2003, Deptula and Francis succeeded at two different trials, the first on liability and the second on damages.  Although it was a difficult case, they obtained a net damages award of approximately $8 million, including statutory interest.  Bank of America appealed these jury verdicts and, due primarily to delays in the preparation of the trial transcripts, this court did not hear the appeal until 2008.  Prestige Imports, supra at 741.

During the sixteen-year period following Prestige's retention of Deptula, there were a number of attempted revisions to the fee agreement.  In 1999, Deptula requested and received a revision that provided him with additional upfront cash and required Schmidt to hold additional money in escrow for the payment of experts.  In 2001, Deptula and Schmidt discussed, but apparently never formalized, another amendment to the fee agreement.  In 2003, Deptula stated that hiring Francis on an hourly basis was Schmidt's choice, and Deptula proposed minor modifications to the fee agreement.  Schmidt responded that the increased upfront payment requested by Deptula be offset by a portion of the fees he was paying to Francis.  It appears that the two never memorialized any of these suggested changes.  In April and December of 2004, and in November of 2007, Schmidt again unsuccessfully requested a change to the fee agreement in light of the money he was spending on Francis.

During the period between the damages trial in 2003 and the 2008 oral argument in Prestige Imports, Schmidt expressed significant frustration with Deptula's performance. On a number of occasions, Schmidt stated or implied that the delays were Deptula's fault. Often, Schmidt drew connections between Deptula's flaws and the hiring and payment of Francis. For instance, in 2004, Schmidt wrote a letter to Deptula stating that his failure to return telephone calls showed "disrespect" and "lack of care and attention towards my case," and that "[i]t was exactly this behavior and attitude which forced me three years ago, two month[s] prior to our first scheduled trial, to hire additional legal help." Schmidt also repeatedly returned to the issue of Francis's fees, expressing his belief that Deptula was procrastinating and producing inferior work product, and then overutilizing Francis to make up for these deficiencies.

Schmidt's frustrations became even more pronounced during the preparation of a brief opposing Bank of America's petition for direct appellate review and the preparation of Prestige's appellate briefs. During this period, Schmidt wrote Deptula another letter stating that he "remember[ed] that [Deptula was] very negative prior to the first trial about our chances to succeed with the bad faith argument" and that "[t]hat attitude is what drove me to seek additional legal advice from Tom

Francis."  Schmidt stated that Deptula was once again displaying this negative attitude, which "ma[de] me feel helpless and without adequate legal representation."  A few months later, Schmidt wrote an electronic mail message (e-mail) to Deptula expressing frustration about his progress in preparing a reply brief, stating that "[i]t appears again that your lack of commitment forces me to engage Tom to complete the job."

These tensions came to a head after the 2008 oral argument in this court.  In the hallway outside the court room, Schmidt expressed -- either by "screaming and yelling" or just "in a somewhat angry voice" -- that he thought that Deptula had failed to make the argument they had agreed he would make.  Schmidt put his feelings into writing in a letter dated April 17, 2008, and titled "WHAT A DISAPPOINTMENT!!!"  There, Schmidt once again expressed his belief that Deptula had failed to make the argument they had agreed upon.  He concluded, "In light of our preparation for this hearing this demonstrates complete disregard for your client's interest and preferences. . . .  I do not know whether your presentation was a result of your overriding determination not to create grounds for a new trial or if you have other ulterior motives. . . .  Until the Appeals Court has made its decision, the final consequences of what I perceive[d] to be a perplexing misrepresentation cannot be assessed."  Deptula replied with a lengthy letter explaining

that he needed to focus on the issues about which the justices asked questions.  Schmidt responded to that letter with an e-mail that repeated his earlier accusations.  He wrote, in relevant part, "Again, I believe[d] that you intentionally avoided these issues to be put in the foreground [sic] in order not to create the possibility of a retrial."

This court issued an opinion on November 19, 2009, that reversed large portions of the jury verdicts in favor of Prestige and remanded the case for a new trial on the issue of liability under a standard less favorable to Prestige.  Prestige Imports, 75 Mass. App. Ct. at 772.  After that, Schmidt began consulting his son-in-law, attorney Joseph (Ted) Killory, for legal advice.  Killory assisted in the preparation of a motion for rehearing before the Appeals Court and an application for further appellate review.  However, at that time, Killory made clear that he would only be able to work on the case on a part-time basis in a supporting role, with Deptula remaining lead counsel.

While the petitions for rehearing and further appellate review were pending, Deptula wrote Schmidt several times suggesting that they discuss a new fee agreement for retrial. In a letter dated January 19, 2010, Deptula stated, in part, "[W]e need to have further discussions about if and how I can handle, with or without assistance, any form of retrial."  In an

e-mail dated February 25, 2010, after further appellate review was denied, Deptula stated, "[A]s you saw, unfortunately the [Supreme Judicial Court] denied further review, therefore we should try to agree on a new fee arrangement, if we can, discuss the costs and need for experts, and then discuss next steps." In a letter dated March 3, 2010, Deptula suggested that he take the case on his "current standard fee agreement" for "partial contingency cases" of $175 per hour plus twenty-five percent of the total recovery including interest. The record does not reveal whether Schmidt ever responded to any of this correspondence.

On March 25, 2010, Deptula met with Killory alone. On Killory's account, which the judge credited, Deptula used this meeting as an opportunity to probe Killory about Schmidt's finances and to discuss the possibility of restructuring the fee agreement. Deptula proposed to Killory that Schmidt either pay Deptula $50,000 to $100,000 more upfront, or increase the contingency percentage to thirty-eight percent so Deptula could bring in another attorney to take the lead in trying the case. Deptula expressed his opinion that the case was a "loser" and said that if he could not restructure the fee agreement his other option would be to resign from the case and file a lien for the value of his services. He said that he thought he had a fifty-fifty chance of success on a lien claim.

On March 31, 2010, Deptula met with Killory and Schmidt. On Killory and Schmidt's account, which again the judge credited, at this meeting Deptula proposed restructuring his fee agreement along the same lines described to Killory earlier. Schmidt said that he would consider increasing the contingency percentage but would not increase it to thirty-eight percent, and that he did not want a different lawyer trying the case. When Schmidt said that he could not afford to pay any more money upfront, Deptula asked how that could be, given that Schmidt had paid Francis $400,000. Schmidt responded that Francis's charges were only so high because Deptula delegated so much work to him.

The judge concluded that this statement about Francis's fees was not an explicit or implicit threat of a malpractice suit nor an attempt to hold Deptula responsible for Francis's fees. The judge reached this conclusion on the ground that making such a threat would have been unreasonable given the lack of legal basis for such a claim and the degree to which Schmidt needed Deptula to participate in the case. The judge also found, in a footnote, that the division of labor between Deptula and Francis was reasonable given the difficulty of the case.

At the March 31 meeting, the parties also discussed Bank of America's most recent offer to settle the case for $2 million. Deptula said that he would not let Schmidt settle the case for that amount unless Deptula received a fee of between $400,000

and $500,000; this was more than he was entitled to receive under the existing fee agreement. Killory responded that it was unethical to try to prevent a client from settling a case. At some point -- the judge found that it was this one -- Deptula's receptionist heard Deptula and one of the other people at the meeting "yelling and swearing" at each other. Shortly afterward, the meeting ended.

In a letter dated April 12, 2010, Deptula stated to Schmidt that he was withdrawing from the case. He explained in this letter that "[t]he trust and confidence necessary for an effective attorney-client relationship [were] not present" for a variety of reasons. The relevant portions of the two paragraphs stating his reasons for withdrawal are as follows:

> "Throughout my representation, you have frequently questioned my strategy decisions, rejected my input and work product, and hampered me from exercising independent professional judgment. Instead of following my advice you relied on the opinions of others . . . .

> "Subsequent to the Appeals Court's decision, you seemed to steadfastly reject any ideas I had or anything I wrote. In a series of meetings, you criticized my diligence. Then, at our March 31 meeting, the tenor of your critique changed and your second-guessing went further than it had before. You unfairly accused me of engaging in unethical conduct, inadequate past performance, showing a lack of proper diligence, and being greedy. You attributed any past trial success to Tom Francis'[s] preparation and asserted that your payments to him were caused by my lack of preparation."

Before sending this letter, Deptula had notified his malpractice insurer of the possibility that a malpractice claim or a

disciplinary complaint would be filed against him. After April 12, Schmidt and Deptula each sent an additional letter, the contents of which are not relevant here, except insofar as the letters made clear that Deptula was withdrawing without Schmidt's consent.

On September 27, 2011, Prestige, represented by Killory and Francis, prevailed at the third trial and obtained a judgment of $27,031,568.12 including statutory interest. On July 8, 2013, Deptula filed a notice of attorney's fees lien pursuant to G. L. c. 221, § 50. In December of 2013, Prestige filed a motion to adjudicate the lien. After the judgment was affirmed in an unpublished decision pursuant to our rule 1:28 dated August 6, 2013, see Bank of America, N.A. v. Prestige Imports, Inc., 84 Mass. App. Ct. 1106 (2013), a five-day, jury-waived trial was held on the lien claim, during which the judge had the opportunity to hear witnesses and assess their credibility. In a decision dated August 15, 2014, the judge ruled that Deptula had forfeited his lien by withdrawing from the case without good cause.

The judge found that Deptula's subjective motivation for withdrawing was his belief that the case would not be profitable. In particular, the judge found that "[t]he reason that [Deptula] quit is that the case, following the disappointing Appeals Court decision of November 19, 2009,

looked very bleak and he did not see a realistic chance of obtaining another favorable jury verdict . . . . Unless the fee agreement could be modified to enhance his economic prospects, as he had expressed several times before the [March 31, 2010,] meeting, he simply was unwilling to continue with a very difficult case and a demanding and critical client." The judge ruled that this financial reason did not constitute good cause for withdrawal. The judge found that Schmidt's statements to Deptula at the March 31, 2010, meeting did not rise to the level of an express or implied threat of a malpractice suit, and so also did not constitute good cause for withdrawal.

Discussion. "Upon appeal, we accept a trial judge's findings of fact unless they are 'clearly erroneous,' and do not review questions of fact if any reasonable view of the evidence and the rational inferences to be drawn therefrom support the judge's findings. We uphold the findings of a judge who saw and heard the witnesses unless we are of the 'definite and firm conviction that a mistake' has been made. Our review of a trial judge's conclusions of law, however, is de novo." Martin v. Simmons Properties, LLC, 467 Mass. 1, 8 (2014) (citations omitted).

"From the . . . appearance in any proceeding . . . , the attorney who appears for a client in such proceeding shall have a lien for his reasonable fees and expenses upon his client's

cause of action, counterclaim or claim, upon the judgment . . . in his client's favor entered or made in such proceeding, and upon the proceeds derived therefrom." G. L. c. 221, § 50, as appearing in St. 1945, c. 397, § 1. However, "an attorney must establish a substantive contractual or quantum meruit basis to recover fees from the client as a prerequisite to filing a lien [under G. L. c. 221, § 50]." Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 249 (1993).

Neither party argues that Deptula has any contractual basis to recover fees. Thus, his only basis to recover fees, and thus for asserting a lien, is quantum meruit. The general rule applicable to cases of this sort is that "[w]hen a lawyer who has entered into a contingent fee agreement with a client is later discharged or withdraws from the case before the contingency occurs, . . . the attorney may be paid only the reasonable value of his services under principles of quantum meruit, rather than recover the contingent fee prescribed by the agreement itself." In the Matter of the Discipline of an Attorney, 451 Mass. 131, 142 (2008). This rule applies at least when, as here, the contingency -- here, Prestige winning a judgment -- has been met. See Liss v. Studeny, 450 Mass. 473, 481 (2008). See also Curly Customs, Inc. v. Pioneer Financial, 62 Mass. App. Ct. 92, 97 (2004) ("[T]he lien exists only on

proceeds obtained by the client in the underlying proceeding; consequently, if there are no such proceeds, there is no lien").

The general rule allowing a lien in these circumstances is qualified, however, by the longstanding principle that a lawyer who voluntarily withdraws from a case without good cause forfeits any claim to an attorney's lien.  See Phelps Steel, Inc. v. Von Deak, 24 Mass. App. Ct. 592, 594 (1987), citing Powers v. Manning, 154 Mass. 370, 375-377 (1891); Kourouvacilis v. American Fedn. of State, County & Mun. Employees, 65 Mass. App. Ct. 521, 527-528 (2006).  "Whether withdrawal works a waiver of the attorney's lien depends on whether the attorney had good cause to withdraw."  Phelps Steel, Inc., supra.  The court in Phelps Steel, Inc. held that the "[b]reakdown of the lawyer-client relationship serves as good cause for withdrawal, without waiver of the attorney's lien.  The lawyer-client relationship is founded on trust and confidentiality.  When those foundations deteriorate, it is not only impractical to persist in the relationship, it diminishes the integrity of the bar to do so."  Ibid. (citations omitted).

The facts found by the judge demonstrate a breakdown of the attorney-client relationship and the trust that must underlie it; therefore, good cause for withdrawal existed.  Schmidt's statement that he had to pay Francis $400,000 because Deptula delegated so much work to him was just the latest in a long line

of similar accusations against Deptula.  As described supra, these accusations dated back to 2004, but had intensified after the 2008 oral argument in this court.  The accusations included allegations of laziness, unprofessionalism, lack of commitment to the case, failure to provide adequate legal representation, ulterior motives, and intentional sabotage.  Schmidt had degraded and humiliated Deptula in e-mails, in letters, and, after oral argument in this court, in public, over the course of several years.  In light of this history, Schmidt's statement amounted to a renewal of these accusations, which confirmed the continued existence of a longstanding breakdown of the attorney-client relationship.  Phelps Steel, Inc. does not require either that Schmidt's statement rise to the level of an express or implied threat of a malpractice suit, or that Deptula's withdrawal was mandated by the Rules of Professional Conduct. See Pearlmutter v. Alexander, 97 Cal. App. 3d Supp. 16, 20 (1979) (entitlement to lien not waived where attorney permissibly withdrew "where the client's conduct . . . render[ed] it unreasonably difficult for the attorney to carry out his employment effectively"), cited with approval in Phelps Steel, Inc., supra at 594.[5]  In the circumstances of this case,

_____

[5] We disagree with Prestige's contention that Deptula was not permitted to withdraw under the Rules of Professional Conduct.  See Minkina v. Frankl, 86 Mass. App. Ct. 282, 293 (2014), quoting from Mass.R.Prof.C. 1.16(b)(5), (6), 426 Mass.

Deptula's withdrawal did not work a waiver of his statutory right to an attorney's lien for the value of the work he performed during his seventeen-year representation of Prestige. Accord Phelps Steel, Inc., 24 Mass. App. Ct. at 594 (in determining whether there has been waiver, "[i]t is also a factor in favor of [the law firm] that it had rendered substantially all the services required to obtain a favorable result for [the client] at the trial level. Thus . . . there was, assuming some good cause for withdrawal, a solid basis for the statutory lien, which attaches '[f]rom the authorized commencement of an action.' G. L. c. 221, § 50").

Prestige argues, and the judge found, that whatever the objective case with respect to the presence of good cause, Deptula's subjective motivation for withdrawal was financial; in essence Deptula had made a calculation that continued representation of Prestige was no longer a good bet in light of his contingent fee agreement. The proper method for assessing good cause in determining the applicability of the attorney's

---

1435 (1998) ("According to the Massachusetts Rules of Professional Conduct, 'a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if . . . the representation . . . has been rendered unreasonably difficult by the client . . . [or] other good cause for withdrawal exists'"). We need not and do not determine whether the standard for permissive withdrawal under the rules is coextensive with the good cause standard required to avoid waiver of an attorney's lien in a contingent fee case.

lien statute in a contingency fee case, however, does not involve determining the withdrawing attorney's subjective motivation, something that would be difficult to do with any confidence. Rather, as indicated in Ambrose v. Detroit Edison Co., 65 Mich. App. 484, 488-489 (1975), on which we relied in Phelps Steel, Inc. in initially adopting the good cause rule, the proper inquiry is whether, viewed objectively, the facts demonstrate the existence of good cause for withdrawal. In Ambrose, supra at 487, the withdrawing attorneys put forth four different grounds that they asserted supported their claim of good cause for withdrawal. Rather than exploring which among them was the actual, subjective reason for withdrawal, the court concluded simply that "[s]ince the record here shows good cause for the attorneys to withdraw, we hold that the trial judge properly imposed an attorneys' lien in this case." Id. at 488. Similarly here, where the objective facts demonstrate the existence of good cause for withdrawal, we conclude Deptula is entitled to an attorney's fees lien.

This result is supported by broader considerations about the role of contingency fee agreements in our justice system. As other jurisdictions have recognized, allowing attorneys to withdraw from contingent fee agreements and still retain compensation risks undermining the viability of the arrangements altogether. See, e.g., Augustson v. Linea Aerea Nacional-Chile

S.A. (LAN-Chile), 76 F.3d 658, 664 (5th Cir. 1996); Bell & Marra, PLLC v. Sullivan, 300 Mont. 530, 538-539 (2000); Ausler v. Ramsey, 73 Wash. App. 231, 237-238 (1994).  However, an attorney who agrees to bear the risk of losing a case is not thereby forced to bear the risk that his client's behavior will cause a breakdown in the attorney-client relationship.  When an attorney withdraws due to the behavior of the client, he is thus entitled to the reasonable value of services rendered, even while losing the opportunity for a larger payoff if, as occurred here, another attorney is able to win a significant judgment.

The judgment is reversed, and the case is remanded for a determination of the reasonable value of Deptula's services under principles of quantum meruit, and for entry of a judgment granting him a lien in that amount.[6]

So ordered.

---

[6] We deny Prestige's request for double costs and appellate attorney's fees.